In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-3232

VIRGIL M. SHAUGER,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE, Commissioner of
Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:11-cv-00129-bbc—**Barbara B. Crabb**, *Judge*.

ARGUED FEBRUARY 29, 2012—DECIDED MARCH 22, 2012

Before BAUER, ROVNER and WOOD, *Circuit Judges*.

BAUER, *Circuit Judge*. Virgil M. Shauger, a 50-year-old former welder who suffers from a nerve disorder that impairs his vision, challenges the denial of his application for Social Security disability benefits. An Administrative Law Judge ("ALJ") disbelieved Shauger's testimony about the severity of headaches caused by his condition, and on that basis found him not disabled.

Because this adverse credibility determination is not supported by substantial evidence, we return the case to the agency for further proceedings.

## I. BACKGROUND

Shauger operated a welding company in Milwaukee, Wisconsin, from 1989 to 2004. He was forced to sell his business in April 2004 after the symptoms of his disorder had worsened. Shauger was living in Florida in 2007 when he applied for disability insurance benefits, alleging onset in April 2004. Medical records of his vision problems date back to late 1988 when, at age 27, he first sought treatment for symptoms including double vision, eye strain, and facial numbness. Shauger had experienced similar symptoms six months earlier, but that initial bout had cleared after a few days and so he did not think more about it. After a battery of tests, Shauger was diagnosed in 1988 with abducens nerve palsy of the left eye. This disorder, commonly known as sixth nerve palsy, describes a paralysis of the muscle controlling lateral eye movements. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1365 (32d ed. 2012).

The treatment for sixth nerve palsy depends on the cause. Several causes are common among adults, including head trauma, infection, diabetes, brain aneurism, multiple sclerosis, and tumors. *See* Loyola University Chicago Stritch School of Medicine, *Sixth Nerve Palsy*, http://www.stritch.luc.edu/depts/ophtha/adult_strabismus/sixth_nerve_palsy.htm (last visited Mar. 19, 2012); U.S. National Library of Medicine,

Medline Plus, *Cranial Mononeuropathy VI*, http://www.nlm.nih.gov/medlineplus/ency/article/ 000690.htm (last visited Mar. 19, 2012). Symptoms of sixth nerve palsy often include double vision, headaches, and pain around the eye. *See* The University of California-Irvine Gavin Herbert Eye Institute, *Neuro-Ophthalmology*, http://www.eye.uci.edu/ neuroophthalmology.html#AbducensNerve (last visited Mar. 19, 2012); U.S. National Library of Medicine, Medline Plus, *Cranial Mononeuropathy VI*, http://www.nlm.nih.gov/ medlineplus/ency/article/000690.htm (last visited Mar. 19, 2012). Because the treatment varies by etiology, physicians typically start by giving patients a barrage of tests to determine the cause of the palsy. *See* U.S. National Library of Medicine, Medline Plus, *Cranial Mononeuropathy VI*, http://www.nlm.nih.gov/medlineplus/ency/article/ 000690.htm (last visited Mar. 19, 2012). Some cases of sixth nerve palsy go away on their own, and others may persist. *Id*.

Shauger speculates that his palsy stems from head trauma suffered in 1988 when he fell 13 or 14 feet on a welding job, and landed on the left side of his face on the concrete. His first symptoms surfaced after this accident. In 1988 and 1989, his doctors ran several clinical tests to determine the cause of his palsy, including an MRI and an angiography. No specific cause ever was found. Shauger continued working and did not seek treatment again until 1996, after his vision problems had worsened and he started experiencing headaches. Shauger had tried several types of glasses, but the headaches persisted. A neurologist confirmed the previous

diagnosis of left sixth nerve palsy (he described Shauger's affliction as "rather remarkable"), but further testing again failed to identify the root cause. An ocular examination in 1998 showed that Shauger's palsy was marked by hypertropia and diplopia. Hypertropia is a misalignment of the eye, and diplopia is double vision. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 525, 898 (32d ed. 2012). In July 2007, a month before he applied for disability benefits, Shauger consulted an optometrist who concluded that he still suffered from double vision and prescribed glasses. The Commissioner of Social Security contends that this doctor prescribed *prism* glasses, which can help correct double vision by shifting the image entering the affected eye and allowing for coordinated vision with less lateral movement in that eye. American Optometric Association, *Strabismus*, http://www.aoa.org/x4700.xml (last visited Mar. 19, 2012). The eyeglasses prescription is indecipherable, though Shauger has not disputed the Commissioner's interpretation.

After Shauger filed his disability claim in August 2007, several other doctors evaluated his condition. Dr. Martha Pollock, an internist, examined Shauger in October at the request of the Florida Department of Health and confirmed the diagnosis of left sixth nerve palsy. Two other doctors then reviewed Shauger's medical records for the state agency. The first, an ophthalmologist, opined that prism glasses should minimize or eliminate Shauger's double vision in all gazes except directly to the left. Even so, the ophthalmologist advised Shauger should avoid concentrated exposure to hazardous condi-

tions no matter how successful prism glasses might be. The second doctor, an OB/GYN, opined that Shauger, due to his balance difficulties, always should avoid ladders, ropes, and scaffolds and only rarely should climb ramps or stairs. This consultant also recommended that Shauger avoid even moderate exposure to hazardous machinery.

The agency denied Shauger's disability claim initially and on reconsideration, and he received a hearing before an ALJ in July 2009. Shauger testified that he last worked in 2004 when he was forced to sell his company because of his impaired vision. At the time of the hearing, Shauger still suffered from double vision, and he explained that he must turn his head to the left in order to focus his eyes. Looking straight ahead, he said, causes eye strain and burning, watery eyes. Headaches set in after 15 minutes of trying to focus, so he cannot read or watch TV for more than brief periods. He testified that most days he suffers two or three severe headaches lasting 30 to 45 minutes each, which force him to lie down and shut his eyes with a cool compress on his forehead. Shauger explained that he relied on ibuprofen and eye drops but did not take any prescription medications. He testified that several times he had tried covering the affected eye with a patch but he saw no improvement in his balance or depth perception. When asked by his attorney whether he continued to see eye specialists and neurologists, Shauger answered that he did not because he had been told there was nothing more they could do.

The ALJ also solicited testimony from an internist and a vocational expert. Dr. Sami Nafoosi had reviewed Shauger's medical records and listened while he testified but did not examine Shauger. He asserted that Shauger's disorder does not meet or equal a listing but does prevent him from taking jobs requiring depth perception, especially positions requiring exposure to heights, heavy machinery, or open water. Dr. Nafoosi's direct testimony spans less than two pages of the hearing transcript, and he did not even mention Shauger's complaints of disabling headaches. When cross-examined about that subject, Dr. Nafoosi conceded that sixth nerve palsy "could result in headache" but asserted, without explanation, that Shauger's head-aches would not be severe enough to require unsched-uled breaks during the course of the workday or "further limit him." The ALJ asked no follow-up questions. The vocational expert acknowledged that Shauger cannot perform his past work of welding but suggested that a person of Shauger's age, education, work experience, and limitations is qualified for available jobs in-cluding "dining room attendant," "kitchen helper," and "laundry worker." The vocational expert conceded, though, that Shauger is unemployable if his headaches require unscheduled, 30-minute breaks two or three times daily. He also conceded that there could be a sig-nificant erosion of potential job options if Shauger has difficulty working in small, narrow places like a kitchen.

One month after the hearing, Shauger initiated a con-sultation with Dr. Maxim Gorelik, an ophthalmologist.

Dr. Gorelik echoed the prior diagnosis of left sixth nerve palsy, and stated that double vision and depth perception prevent Shauger from safely working in an environment that requires hand-eye coordination. Dr. Gorelik also opined that prism glasses might provide some relief. Shauger's lawyer forwarded Dr. Gorelik's report to the ALJ.

In January 2010 the ALJ rejected Shauger's disability claim, concluding that he could transition from welding to other work. Applying the required five-step analysis, *see* 20 C.F.R. § 404.1520(a)(4), the ALJ determined that (1) Shauger had not engaged in substantial gainful activity from his alleged onset in 2004 through his date last insured in 2007, (2) his left sixth nerve palsy constitutes a severe impairment, (3) this impairment does not meet or equal a listed impairment, (4) Shauger could not perform his past relevant work of welding through the date last insured, and (5) there exist jobs in the economy he still could perform. The ALJ said little about Shauger's headaches. She wrote that Shauger "complains of headaches" but reasoned that they must be "non-severe" because he was not using prescription drugs and—so the ALJ thought—had never sought medical care for them. The ALJ did not acknowledge Shauger's testimony about the severity and frequency of his headaches, his response to those headaches, or the effect the headaches have on his daily activities. She opined that he had the residual functional capacity to perform a full range of work at all exertional levels through the date last insured and gave the "greatest weight" to the opinion of Dr. Nafoosi. The ALJ asserted

that Shauger's "statements concerning the intensity, persistence, and limiting effects" of his symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." She cited what she characterized as a "sparse and sporadic" treatment history for sixth nerve palsy and his purported failure to "ever" seek treatment for headaches. The ALJ also discredited Shauger's testimony that doctors had said nothing else could be done for his condition. His testimony, the ALJ reasoned, was contradicted by Dr. Gorelik's opinion that Shauger might benefit from prism glasses. Shauger challenged the ALJ's decision in the district court, lost, and now appeals.

## II. DISCUSSION

On appeal, Shauger argues that the ALJ erred in finding him not credible. Because the Appeals Council denied review, we evaluate the ALJ's decision as the final word of the Commissioner. *See Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). Our review is confined to the rationales offered by the ALJ, *see SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), and asks whether the ALJ's decision is supported by substantial evidence, 42 U.S.C. § 405(g); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). We give an ALJ's credibility determination special, but not unlimited, deference. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). The ALJ must

consider a number of factors imposed by regulation, *see* 20 C.F.R. § 404.1529(c); S.S.R. 96-7p, 1996 WL 374186, and must support credibility findings with evidence in the record, *Villano*, 556 F.3d at 562.

Shauger begins by correctly noting that the ALJ's initial explanation for disbelieving his testimony—that his "statements concerning the intensity, persistence, and limiting effects" of his symptoms were "not credible to the extent they are inconsistent with" the judge's assessment of his residual functional capacity—is meaningless boilerplate seen frequently in decisions from ALJs. We have criticized this template as unhelpful, *Bjornson v. Astrue*, No. 11-2242, 2012 WL 280736, at *4 (7th Cir. Jan. 31, 2012); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir. 2010), and explained that it backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility," *Bjornson*, 2012 WL 280736, at *5. Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing. *See Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir. 2011); *Parker*, 597 F.3d at 921-22.

Shauger principally argues that the ALJ could not discredit his testimony based on a perception of unexplained gaps in his treatment history. Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference. S.S.R. 96-7p, 1996 WL 374186, at *7; *Moss v. Astrue*,

555 F.3d 556, 562 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). An ALJ may need to "question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner." S.S.R. 96-7p, 1996 WL 374186, at *7. The claimant's "good reasons" may include an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects. *Id.* at *8. Here, the ALJ made no effort to question Shauger about the perceived gaps in his treatment history between 1988 and 2009.

More importantly, the reason for the "gaps" is obvious. Shauger suffers from a condition that, by definition, may wax and wane. *See* U.S. National Library of Medicine, Medline Plus, *Cranial Mononeuropathy VI*, http://www.nlm.nih.gov/medlineplus/ency/article/000690.htm (last visited Mar. 19, 2012). Shauger has not claimed that his condition was disabling before 2004. After he was diagnosed in 1988, he submitted to a full regimen of diagnostic tests, but the underlying cause was never discovered. He continued working and dealt with his impairment. It was not until 1996 that Shauger's impairment became more pronounced. As noted in his medical records, Shauger had "remained about stable" for eight years but now suffered from "a rather remarkable left sixth palsy" that was precipitating headaches. Again Shauger had a battery of tests, including an angiogram and a Tensilon test with their associated risks, and again no cause was determined. Even so, he pressed on with his job, treated his head-

aches with over-the-counter medications, and tried to live a normal life. It was not until 2004 that, by his account, Shauger no longer could cope, and only then did he apply for disability.

On the ALJ's logic, a person suffering from an impairment that has not become disabling must act and seek treatment as if the condition *is* disabling or else run the risk that any future assertion that the impairment has worsened will be viewed as a lie. We have recognized that even persons who *are* disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005); *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003). Shauger emphasizes this point particularly with his purported lack of treatment history for his headaches. Not only did the ALJ fail to seek an explanation for the perceived lack of treatment, but her analysis rests on a misreading of the administrative record. In discrediting Shauger's testimony about the severity of his headaches, the ALJ asserts that "there is no indication from the medical evidence of record that the claimant ever sought treatment for headaches." To the contrary, Shauger's medical records leave no room for doubt that he initiated the second round of neurological testing in 1996 *because* he had serious headaches stemming from his left sixth nerve palsy.

Shauger further disputes the ALJ's conclusion that he undermined his credibility by testifying that doctors could do nothing else for his condition. This statement

is false, the ALJ surmised, because "in the 2009 treatment note, his doctor recommended a special type of glasses to help with his malpositioning." Shauger correctly points out that it was *July* 2009 when he testified that his treatment options had been exhausted, and not until *August* 2009 that he consulted with Dr. Gorelik, who recommended prism glasses. The ALJ received Dr. Gorelik's report after the hearing. When issuing her decision in January 2010, the ALJ apparently overlooked the timing of Shauger's consultation with Dr. Gorelik and thus, in effect, labeled Shauger's hearing testimony as false because he did not anticipate the result of a medical visit that would not occur until the following month. The Commissioner argues that this miscue should not matter because Shauger had been prescribed the same type of glasses in July 2007, but the ALJ did not mention the 2007 prescription, and the agency may not bolster the ruling with evidence the ALJ did not rely on. *See Chenery*, 318 U.S. at 93-95; *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010).

Finally, Shauger challenges the ALJ's evaluation of his headaches, arguing that she failed to properly consider the relevant evidence including his daily activities, the timing and duration of his headaches, and the measures taken to treat the headaches. *See* 20 C.F.R. § 404.1529(c); S.S.R. 96-7p, 1996 WL 374186, at *3. We agree. The ALJ ignored several of the factors listed in Social Security Ruling 96-7p, including that Shauger testified that (1) he could not read or look at a computer screen for more than 10 to 15 minutes without getting a headache, (2) he dealt with the pain by lying down with a cold compress and closing his eyes for 30 to 45 minutes, (3) the head-

aches occurred at unscheduled times, two or three times a day, (4) his wife handles all household accounts because he cannot, and (5) he sought treatment for headaches as far back as 1996. *See* 20 C.F.R. § 404.1529(c); S.S.R. 96-7p, 1996 WL 374186, at *3. Without any discussion of these relevant factors, the ALJ failed to build a logical bridge between the evidence and her conclusion that Shauger's testimony was not credible. *See Villano*, 556 F.3d at 562.

In response to this argument, the Commissioner asserts that the ALJ reasonably considered Dr. Nafoosi's representation that Shauger's headaches had not been severe. We reject this contention. The ALJ did not mention this aspect of Dr. Nafoosi's testimony despite saying that she had given the greatest weight to his opinion. Moreover, reliance on Dr. Nafoosi's superficial testimony in general, and this statement in particular, would have been problematic. Dr. Nafoosi did not hint that he had experience with patients afflicted with sixth nerve palsy, nor did he say anything suggesting knowledge of the severity of headaches typically associated with this affliction. He had not personally examined Shauger, and, like the ALJ, said nothing about the extensive testing conducted in 1996 after Shauger had complained about severe headaches. No factual evidence in the record contradicts Shauger's testimony about the severity of his headaches, and Dr. Nafoosi offered no medical reason for doubting Shauger's statements. Instead, it seems to us that Dr. Nafoosi went beyond the permissible bounds of a medical expert and usurped the ALJ's role by making his own credibility assessment after observing Shauger testify. *See Allen v.*

*Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) ("[C]redibility determinations with respect to subjective complaints of pain rest with the ALJ."); *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) ("It [is] the ALJ's task to resolve conflicts in the evidence and issues of credibility."); S.S.R. 96-7p, 1996 WL 374186, at *4 ("The adjudicator must then make a finding on the credibility of the individual's statements."). Without any basis for Dr. Nafoosi's opinion, the ALJ had the duty to develop a full and fair record. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009). And yet the ALJ did not ask Dr. Nafoosi any follow-up questions to determine what medical explanation, if any, he had for his skepticism about the severity of Shauger's headaches. *See Bjornson*, 2012 WL 280736, at *7-*8 (concluding that it was impossible to discern basis for non-examining doctor's expressed skepticism about claimant's complaints of pain); *Campbell*, 627 F.3d at 308-09 (concluding that ALJ did not adequately explain reason for relying on opinion of non-examining medical expert who testified that claimant was still drinking daily when records showed claimant was sober).

## III. CONCLUSION

For the reasons stated herein, we REVERSE the judgment of the district court and REMAND the case with instructions that it be returned to the SSA for further proceedings consistent with this opinion.