Clyde PLOENSE, Plaintiff,

v.

Carolyn W. COLVIN, Commissioner
of Social Security, Defendant.

Case No. 15–CV–376

United States District Court,
E.D. Wisconsin.

Signed March 8, 2016

Dana W. Duncan, Duncan Disability Law SC, Wisconsin Rapids, WI, for Plaintiff.

Social Security Administration, Brian E. Pawlak, United States Department of Justice, Milwaukee, WI, Eric H. Schepard, United States Social Security Administration, Chicago, IL, for Defendant.

## DECISION AND ORDER

William C. Griesbach, Chief Judge, United States District Court

This is an action for judicial review of a decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). Following a hearing before an ALJ, Plaintiff Clyde L. Ploense's application for disability insurance benefits was denied. Ploense contends that the Commissioner's decision should be remanded for further proceedings because the ALJ based his decision denying his application upon a vocational expert's response to a flawed hypothetical question. For the reasons that follow, the Commissioner's decision will be affirmed.

## I. BACKGROUND

On January 21, 2011, Plaintiff Clyde L. Ploense, age 49 at the time, filed an application for disability and disability insurance benefits under the Social Security Act alleging an onset date of November 11, 2010. R. 174. Ploense claimed that he was unable to work as a result of cognitive impairment caused by a closed head injury he sustained on August 13, 2010, while

working as an interstate truck driver. R. 197–98. According to the medical records, Ploense told doctors that in the morning hours of August 13, 2010, he was laying in the sleeping unit of a tractor-trailer when his co-driver fell asleep at the wheel. The truck veered off the highway outside of Joplin, Missouri and crossed the median into oncoming traffic. The driver eventually regained control of the vehicle and drove back into the correct lane by going over the median again. Ploense claimed that he was tossed about the sleeper berth and suffered multiple contusions to his head and across his upper extremities, torso, and his right foot and left calf. Despite the violent impact to which Ploense claims he was subjected, the truck remained upright and undamaged. Once the driver regained control, he continued on and drove an additional eight hours back to Wisconsin. R. 345, 363.

Five days later, on August 18, 2010, Ploense reported to Dr. Charles Capasso at Affinity Occupational Health in Menasha, Wisconsin that he had developed more significant aching discomfort across the mid and low back regions, as well as headache and neck pain, on the return trip. He claimed that he had sought medical attention immediately on his return to Wisconsin and had been diagnosed with multiple contusions and prescribed a conservative course of care, though there is no report of that visit in the record. Ploense told Dr. Capasso that he was quite stiff and sore over the next 24 to 48 hours with most of the discomfort having settled into his low-back region with increased low back discomfort when seated. No loss of consciousness was reported. At his August 18 visit at Affinity Ploense told Dr. Capasso, "I'm quite a bit better now." R. 345.

A physical examination at that time revealed "no noticeable areas of bruising across the upper and lower extremities, nor across the trunk." R. 345. There was an almost fully healed abrasion over the vertex of the scalp with no local signs of infection. *Id.* Dr. Capasso noted that Ploense's affect was modulated appropriately throughout the interview and there were no bizarre or aberrant thought processes displayed. Dr. Capasso's final assessment was "history of multiple contusions across the scalp, upper back, mid-back, lower back regions as well as the lower extremities, with scalp abrasion, injury date 8/13/10, without significant neurologic, musculoskeletal, or other complications as of 8/18/10." R. 347. Ploense was shown some back exercises, given an instruction booklet, and encouraged to return to all of his normal daily activities including his driving responsibilities. *Id.*

Ploense was next seen at by Dr. Capasso at Affinity almost three months later on November 15, 2010, after he was referred there by his employer to assess his fitness for work. His chief complaint at that time was headache and memory loss. R. 349. Ploense reported that he had been having daily bouts of diffuse and vague headaches, possibly right side of the scalp greater than left, without an advancing pattern of disequilibrium or bladder or bowel dysfunction. He reported that his sister had confronted him the previous week about his cognitive performance, primarily memory loss, and told him to get it checked out. He also reported he had an episode of vomiting in his brother-in-law's car on November 10, 2010, which prompted him to see his primary care physician, Dr. Douglas Moard, at Thedacare Physicians Darboy on November 11, 2010. *Id.*

According to the record of his November 11, 2010 visit with Dr. Moard, Ploense described the August 13, 2010 incident of his co-driver veering off the highway on the trip back from Joplin, Missouri. Ploense told Dr. Moard that after the driv-

er woke up and regained control of the truck, Ploense told him he was hurt and asked him to stop. The driver refused and kept driving for another 45 minutes until they arrived at a truck stop. Ploense then used his cell phone to take a picture of the injury to his scalp (which he showed Dr. Moard) and then called the dispatcher for the trucking company to request permission to check into a hotel so the driver could sleep. Ploense stated that he had already driven the amount of time he was permitted under interstate trucking regulations. The dispatcher refused his request, however, and they returned to Wisconsin. Ploense reported to Dr. Moard that he had struggled with memory, slowed cognition, and significant headaches since that day. He claimed he had on several occasions attempted to get into the wrong vehicle and had asked an assistant to watch out for abnormal behavior. Dr. Moard thought that Ploense struggled to convey the history, and though there was no sign · of parietal injury and his fine motor coordination seemed normal, Dr. Moard removed him from driving due to his Workman's Compensation injury. His assessment was closed head injury with deficits and residual headaches. R. 363. It was this action that apparently led Ploense's employer to request Dr. Capasso to evaluate him on November 15, 2010.

With respect to the vomiting episode that prompted his visit with Dr. Moard, Dr. Capasso noted that Ploense "changed his story several times," "[f]irst denying having an episode of vomiting prior to November 10th, then identifying October 1st as an episode of vomiting." R. 349. There is no mention of it at all in Dr. Moard's November 11 report. R. 363. Dr. Capasso also noted that Ploense's speech was "slow, measured, and deliberate. His affect was primarily flat, modulating very little throughout the interview." R. 350. Dr. Capasso described Ploense's mood as "predominantly one of confusion with some degree of anxiety. He noted "his thought content rambled, at times with a degree of confabulation." *Id.* Dr. Capasso also noted that Ploense referenced conflicts he had been having with supervisors at work. Based on his examination, Dr. Capasso agreed with Dr. Moard that a medical work-up should be pursued. R. 351.

On November 29, 2010, Ploense was seen by Dr. Scott Powley at Thedacare Orthopedics Plus Center For Rehabilitation Services. Ploense again described the incident with the truck veering off the road in detail but denied any loss of consciousness. He told Dr. Powley that all of the back and neck pain he had from the incident resolved and he continued to have only headache pain. Ploense reported that his headache pain was worse with any movement or jarring activities. He claimed that he gets nauseated and had vomited on several occasions with severe headaches. He also claimed he was having trouble with cognition. As examples he noted that it had taken him multiple days to assemble the cab for his snow blower instead of the hour or two the instructions suggested would be needed. He also noted that he would forget where he parked his truck when he was back at work and had tried to get into someone else's truck before realizing his mistake. He stated he was forgetting to pay his bills. R. 364. More recently, Ploense stated that his headaches had been less. R. 365.

In the Social/Vocational History section of his report, Dr. Powley noted that Ploense told him that he lived by himself and had worked for over two years as a truck driver at Straight Shot Express. Prior to that he had worked in a factory. Ploense claimed he was in training to work for the Department of Defense with the goal of working as a contractor flying "predator drones." The job required that he

be able to run two miles in under fourteen minutes wearing a flack jacket and Army boots. R. 365. Ploense noted that he had returned to running and jogging after the incident but quit in September because it seemed to aggravate his symptoms. R. 365.

Dr. Powley's impression was that Ploense's symptoms were consistent with post concussion syndrome. He complained of persistent headaches that worsened with exertion and difficulty with concentration and memory. Dr. Powley also thought Ploense's presentation was suggestive of a post traumatic stress disorder or at least a substantial emotional overlay concerning the incident. *Id.* He prescribed a trial of Amitriptyline for Ploense's headaches and referred him for neuropsychological testing. R. 366.

On November 24, 2010, Ploense returned to Dr. Moard for a follow-up on his head injury. Ploense reported that he continued to have significant cognitive impairment and residual headaches. Dr. Moard noted that a CT scan of Ploense's brain was normal with no evidence of intercranial hemorrhage, mass effect, midline shift, or acute infarcts. The ventricles were all normal in size. Dr. Moard also noted that neuropsychiatric testing was scheduled for December 20 and 21 with Dr. Daniel Condit, a clinical neuropsychologist. R. 382, 393, 404.

In fact, Dr. Condit evaluated Ploense on four separate dates: December 20, 21, 23 and 30, 2010. Ploense recited the history of his head injury, but this time expressed uncertainty whether he had lost consciousness. He stated he vomited afterwards. R. 404–405. He also stated that the dispatcher refused to authorize a doctor visit at the time and instructed him not to call the police. Ploense reported that the driver was not injured and told the dispatcher that he had only briefly drifted onto the shoulder before steering back into his lane.

Since the incident Ploense reported that he had been experiencing cognitive problems, frequent headaches, and ringing in his ear. He claimed he was dropping items, such as utensils, pens/pencils, more than before and he began having problems with stuttering. He also reported problems with concentration, short-term memory, organization, multi-tasking, word-retrieval, and reading. R. 405.

The results of the testing conducted by Dr. Condit did not support Ploense's claim of cognitive impairment. The Summary And Conclusions section of his report reads:

> Present findings demonstrate intact abilities in all areas tested. Specifically, performances on measures of attention, intellectual abilities, language, cognitive efficiency, executive functioning, memory, visuospatial, and motor functioning were all within normal limits. In fact, some performances were above average. Simple attentional and working memory abilities were average to superior. Overall intellectual functioning was estimated to be average (estimated FSQI = 100). Language testing demonstrated low average to high average performances on measures of comprehension, confrontation naming, and verbal fluency (phonemic and semantic). Cognitive efficiency and executive functioning were average. Regarding memory, performances were average to above average on all measures. Learning and recall of 16–item word list over repeated trials was superior, with free recall after short and long delay intervals. Learning and recall of a visual arrangement of designs was average. Visuospatial and motor performances were also within normal limits on all measures. There is no cognitive disorder.

R. 409 (underline original). In the Recommendations and Considerations section of

his report, Dr. Condit noted that "the head injury sustained by Mr. Ploense was probably mild, and would not be expected to result in permanent cognitive deficits due to brain damage." Symptoms from a mild head injury, he noted, "may persist for weeks, but typically resolve fully within three months." R. 409. Dr. Condit's conclusion as to Ploense's emotional functioning, however, was less positive. Emotionally, Dr. Condit concluded that the results of psychological/personality testing suggested "defensive responding, somatic complaints, mistrustfulness, and difficulties in interpersonal relationships." Dr. Condit further noted that "[r]esults of three self-report mood inventories suggested mild anxiety, minimal depression, and moderate hopelessness." *Id.*

On January 3, 2011, Ploense saw Dr. Moard for a follow up visit. Ploense reported his post traumatic headaches were 50 % better. He noted it takes a little activity to provoke a headache, and that once provoked, a headache could last almost a day. Dr. Moard noted that Ploense had passed the cognitive testing "with flying colors." He noted that both he and Ploense were surprised at how well he did, but in talking with him, Dr. Moard thought it clear "his symptoms have improved a lot." Dr. Moard noted that it was much easier to communicate with Ploense because his answers were coming quickly whereas in the past Ploense's visits took a long time because his answers were so painfully slow. Dr. Moard agreed to send in a report to the Wisconsin Department of Transportation so Ploense could get his driver's license back, but noted Ploense had lost his job as a truck driver. Ploense seemed to accept that he could not return to his previous job. He said the environment was hostile to him and he didn't think things would go well if he returned. He said he had an attorney working on his case. Ploense said he preferred becoming a military contractor and working in Af-

ghanistan flying drones. He planned to apply in February but needed to train so he was in the physical condition required. Ploense told Dr. Moard that "cognitively he can pass any test that they sent his way and he is confident that he [could] perform a flight simulator without any trouble." R. 421–22.

Notwithstanding the results of his neuropsychological testing and his plans to become a military contractor, Ploense filed his application for disability benefits on January 21, 2011, alleging a cognitive impairment. This was not Ploense's first application for Social Security disability benefits. A previous application was denied at the hearing level on June 27, 1991. R. 193. His previous application was apparently based on an injury to his back around that time. R. 447.

As to his new claim, Ploense claimed in a Function Report submitted to the Social Security Administration (SSA) on March 15, 2011, that he became confused, anxious, distracted and distressed easily. He described his typical day as "make coffee; read Bible; make breakfast; eat; do hygiene; get dressed; read notes on what I should do; check calendar for day's activities; begin working on paperwork; get confused, anxious, distracted and distressed easily; make and eat lunch; continue with paperwork; phone calls; get clarification; worry about deadlines; usually get headaches and need to lay down for 2 hours; go back to paperwork; make meal; eat; occasional walk to post office; work on paperwork; make notes on what I did during day; make notes for next days work; listen to radio while checking news on internet; check email; try flight simulator; recharge battery; and go to bed." R. 236. He claimed he had trouble sleeping more than two-to-three hours per night because of headaches and nightmares, but stated he spent nine-to-ten hours in bed

over a twenty-four hour day. R. 237, 244. Ploense listed as hobbies building and flying radio aircraft; ballroom dancing; flight simulator; radio control simulator; and physical training, all of which he did up to five days per week. He claimed he now no longer built models, used his simulator only sporadically, and was no longer able to do his physical training without severe headaches. R. 240.

In the meantime, Dr. Powley referred Ploense to Dr. John Burke, a psychologist at Thedacare Behavioral Health, to address his anxiety and psychological dysfunction. Dr. Burke conducted an initial evaluation on April 15, 2011. In his report, Dr. Burke noted that Ploense completed self-report indices of anxiety and depression, and scored in the minimal to mild range on both. On the psychiatric checklist questionnaire, the problems he checked mainly involved cognitive, problem-solving issues along with headaches and stomach aches. Re. 448. Dr. Burke commented that Ploense came across cognitively as quite slow. He tape-recorded the interview claiming he would not remember details afterward. He stated he had an attorney involved in his case and appeared in moderate psychological stress as it pertained to his problem solving ability. Dr. Burke listed his Axis I diagnosis as anxiety disorder and assigned Ploense a global assessment of functioning (GAF) score of 45. *Id.*

Ploense saw Dr. Burke for counseling for his anxiety over the next two months. He was continuing to ride his bike around the town. He had concluded that he could not return to trucking in part because he did not think he could get positive recommendations from trucking firms. He had come to the conclusion that he needed to find a new occupation, and Dr. Burke encouraged him to begin by going to the state employment office. R. 443. On June 10, 2011, Dr. Burke saw Ploense for

the last time. Dr. Burke noted that Ploense continued to be productive around the home. He had also gone to the employment service and was going to take a class on resume preparation. Ploense took an updated depression inventory and his score minimally changed for the better. It still fell in the mildly depressed range. Dr. Burke agreed to meet one more time with Ploense to try to clarify if there was some particular way that he could help him. Dr. Burke noted that Ploense was facing "enormous distress, but many of these issues are social as opposed to psychological in nature, and he is doing what he can at this point to address them." R. 442.

State agency medical consultants reviewed Ploense's file in July 2011 and found that Ploense had no severe mental or physical impairments resulting in any functional limitations. R. 98, 470, 479. Consultant Esther Lefevre, Ph.D., filled out a Psychiatric Review Technique form on July 14, 2011. She found no functional limitations in activities of daily living; maintaining social function; maintaining concentration, persistence or pace; and no episodes of decomposition. R. 468 In the narrative section of her report, Dr. Lefevre noted that Ploense had a normal CT scan and began rehabilitation in November 2010. She noted that in December 2010 Ploense had passed a full neuropsychological evaluation with flying colors and the next month Ploense told his primary care provider that his headaches had improved by 50%. At that time Ploense was released to get his regular driver's licence back. Dr. Lefevre explicitly noted Dr. Condit's conclusion that Ploense had no cognitive disorder and that his head injury was probably mild and would not be expected to result in permanent cognitive defects due to brain damage. Dr. Lefevre also addressed Ploense's Function Report and contrasted his statements in the re-

port with the neuropsychological evaluation completed three months earlier. She concluded that his statements are not credible. R. 470.

Consulting physician Syd Foster, D.O., likewise reviewed the record and completed a physical RFC assessment form. Dr. Foster also contrasted the results of the neuropsychological testing with Ploense's answers on the Function Report he submitted three months later and concluded that his statements "are not credible." Dr. Foster concluded that Ploense was capable of heavy work, but that he should avoid concentrated exposure to heights and hazards until his residual post traumatic headaches resolve. R. 457. The findings of both consultants were affirmed upon later review by different consultants who reviewed the record in December 2011. R. 479, 480.

On January 31, 2013, Ploense saw Dr. Lisa Kokontis of the Neuroscience Group on a self-referral for headaches. R. 517. After taking his history and reviewing the medical reports, Dr. Kokontis concluded, "giving him the benefit of the doubt, I think he most likely has a combination of tension type possibly superimposed migraine headaches [which had] responded nicely to Nortriptyline...." As to his cognitive complaints, Dr. Kokonitis stated, "[g]iven the mechanism of his injury, other than a few abrasions, no lacerations, or skull fracture, no loss of consciousness, or significant amnesia around the inciting event, I highly doubt that his cognitive issues are related to his accident." She further observed that "[h]is neuropsychological testing being normal also goes against an organic etiology for his complaints." R. 520. Dr. Kokonitis recommended that Ploense restart the Nortriptyline for his headaches with Dr. Moard or the free clinic where he had been receiving care.

In the meantime, after Ploense's application for disability insurance benefits had been denied initially and on reconsideration, he requested a hearing. He appeared before ALJ Carla Waters on August 23, 2013, without counsel. Ploense stated that he did not have time to retain counsel and that he was unable to open the CD containing his file. He asked to postpone his hearing but also requested that the ALJ have him examined by another doctor. ALJ Waters granted the postponement and ordered an additional evaluation. R. 42–47.

On November 12, 2013, Ploense was evaluated by Steven Krawiec, Ph.D., a consulting psychologist. Dr. Krawiec found that Plaintiff had moderate to marked limitations in understanding, remembering, carrying out, and making judgments on detailed instructions, but only mild limitations in understanding, remembering, carrying out, and making judgments on simple instructions. R. 102. Dr. Krawiec also wrote that Plaintiff had mild to approaching moderate cognitive difficulty regarding short term memory and slowness of cognitive processing. R. 491. Dr. Krawiec assigned Plaintiff a current global assessment of functioning score of 59. R. 489.

Ploense's hearing was then rescheduled for April 25, 2014, before ALJ Charles Muhl. Ploense, appearing with counsel, testified that following the truck accident he had a dramatic reduction in his cognitive ability. He testified he had severe short-term memory loss and that he has long-term memory loss. He also testified that he suffered from chronic, "very horrible migraine headaches much of the day, sometimes all day long and they'll sometimes last for two days." R. 62. Ploense testified that he could remain focused on a simple task for only 15 minutes without getting distracted. In an average month,

he testified that he would have migraine headaches every day, including seven days when they would be so severe he could not leave his house. R. 62–63. Ploense testified that this was "pretty much the consistent pattern" since the accident. R. 63. The only medication he was taking was Nortriptyline.

Ploense also testified that he had recently been diagnosed with McArdle disease, which he described as a metabolic disorder that he had all his life. He testified that it caused his muscles to tear and over the past 25 years he probably tore thousands of muscles. Ploense explained that the enzymes caused his muscle fibers to tear easily and that it was widespread throughout his entire body. R. 68. He testified that because of his McArdle disease, he was unable to lift more than a four-quart pot of water or a gallon of milk. The disease also kept him from remaining seated for more than five minutes when he was eating a meal because the muscle cramping was set off by sitting. He has to move around for about five or ten minutes before he can sit down again. R. 69–70. Ploense also testified that he had to lie down every day for about two to three hours at a time. He also stayed in bed about ten or eleven hours a night, though he would not sleep that entire time. R. 70. When asked about the absence of any reference to torn muscles in his medical records, Ploense stated that he was treated by fourteen different chiropractors for about fourteen years and they would tell him he tore a muscle. R. 71. He testified that he was unable to work because he has terrible migraine headaches, he cannot remember anything a supervisor might tell him to do, and because of his torn muscles and severe cramping caused by his McArdle disease. R. 81–82.

Notwithstanding the severity of the impairments he described, Ploense testified that he had been employed at a company called the Binding Edge from May 2013 to February 2014. He was working full-time, forty hours per week, until January 2014, when he went part-time due to "horrible headaches" and "all the injuries and torn muscles" from his McArdle disease. Ploense testified that he requested to go part-time in January but when a supervisor returned to work from a vacation in February, he told him they didn't need him anymore. R. 56–57.

The only witness other than Ploense to testify at the hearing was a vocational expert (VE). The VE was asked to assume a person of Ploense's age, education, and work experience who was capable of work at the heavy exertional level but limited to "simple, routine, repetitive tasks but not at the production rate pace like an assembly one." R. 85. With that assumption in mind, the VE was asked whether such a person could perform any jobs that exist in the national economy. The VE responded that such a person could perform almost 90% of the unskilled jobs and proceeded to list jobs in various exertional classifications that such a person could perform. *Id.*

Two weeks later on May 7, 2014, Ploense's attorney supplemented the record with an April 9, 2014 report of the Neuroscience Group in Neenah, Wisconsin in which Dr. Thomas Mattio states: "I really feel, by his history, [Ploense] probably has McArdle disease." R. 570. Dr. Mattio noted that it was certainly possible that Ploense had "another metabolic myopathy, but McArdle disease seems to fit him best." *Id.* Although a definitive diagnosis requires a muscle biopsy, Dr. Mattio did not feel it was worthwhile to order one because there was no significant treatment for it. Dr. Mattio recommended dietary changes with an increase in complex carbohydrates, low-dose creatine, hydration and pain medication if needed. R. 571. There

is no other mention of McArdle disease in the record.

On August 6, 2014, the ALJ issued his written decision. The ALJ found Plaintiff to have the following severe impairments: status/post-closed head injury and post-concussion syndrome, myalgias, migraine headaches, McArdle disease, and anxiety disorder. R. 98. At steps 2 and 3 of the Social Security Administration's (SSA's) 5–step sequential evaluation process, the ALJ found Plaintiff to have mild difficulties in activities of daily living and social functioning, moderate difficulties in concentration, persistence or pace, and no episodes of decompensation. R. 98–99. Based on these findings, the ALJ concluded that Plaintiff's mental impairment did not meet or medically equal the criteria of Listing 12.06 in 20 C.F.R. Part 404, Subpart P, Appendix I so as to mandate a finding of disability. Instead, the ALJ found from his consideration of the evidence that Plaintiff had the residual functional capacity (RFC) to perform medium work as defined in 20 C.F.R. § 404.1567(c) except: lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk six hours in an eight hour workday and sit for six hours in an eight-hour workday; frequently can be exposed to unprotected heights and moving mechanical parts; and limited to simple, routine, repetitive tasks, but not at a production rate pace (e.g. assembly line). R. 100. With this RFC, the ALJ determined at step 4 that Plaintiff was unable to perform any of his past relevant work as a truck driver or bindery worker. Based on the VE's testimony that such a person could still perform hundreds of thousands of jobs that exist in the national economy, the ALJ concluded at step 5 that Plaintiff was not disabled. R. 1003–1004. The Appeals Council denied review on April 9, 2015, making the ALJ's decision the final decision of the Commissioner.

## II. ANALYSIS

### A. Standard of Review

 On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir.2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir.2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000).

 The ALJ is also expected to follow the SSA's own rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir.2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, re-weighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir.1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir.2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir.2010)).

### B. Hypothetical Question and RFC

Ploense argues that the ALJ erred by failing to include all of the cognitive limita-

tions that the ALJ found that he had in the ALJ's RFC assessment, and then in failing to incorporate those limitations into the hypothetical question he posed to the VE. A claimant's RFC is defined as the most the claimant can do, despite the limitations caused by his physical and mental impairments. 20 C.F.R. § 404.1545(a)(1). In determining a claimant's RFC, the SSA considers the limiting effects of all of the claimant's impairments, even those that are not severe. *Id.* § 404.1545(e). The RFC assessment is first used at step 4 of the sequential evaluation process to determine whether the claimant can perform any past relevant work. *Id.* § 404.1545(a)(5)(i). If the SSA determines that the claimant cannot perform any of his past relevant work, then the RFC assessment is used at step 5 of the sequential evaluation process to determine whether the claimant can perform any other work that exists in the national economy. *Id.* § 404.1545(a)(5)(ii).

In determining whether a claimant can perform any other work that exists in the national economy at step 5 of the sequential process, the ALJ must consider in addition to the claimant's RFC certain vocational factors, including his age, education and work experience. The SSA's Medical–Vocational Guidelines (commonly known as the grids) are used to determine whether the claimant is disabled in most cases when the claimant has only exertional limitations, i.e., those affecting physical strength. *Fast v. Barnhart,* 397 F.3d 468, 470 (7th Cir.2005); 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e)(2). Where the grids do not supply the answer, however, a VE is needed to assist the ALJ in the determination of whether jobs exist that the claimant can perform. The ALJ poses a hypothetical question or a series of hypothetical questions to the VE asking whether a substantial number of jobs exist in the region that a person of the claimant's age, education, and work experience could perform, assuming the RFC determined by the ALJ.

As should be obvious from what an RFC is and this brief description of how it is used in the SSA's sequential evaluation process, it is essential that the ALJ correctly determine a claimant's RFC and fully incorporate the RFC into the hypothetical question posed to the VE if the VE's answer to the ALJ's hypothetical question is to provide a logical basis to the ALJ's determination. Thus, the Seventh Circuit has emphasized that "[a]s a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin,* 758 F.3d 850, 857 (7th Cir.2015). The Seventh Circuit has repeatedly emphasized that "[t]his includes any deficiencies the claimant may have in concentration, persistence, or pace." *Id.* (citing *O'Connor–Spinner,* 627 F.3d 614, 619 (7th Cir.2010) and *Stewart v. Astrue,* 561 F.3d 679, 684 (7th Cir.2009)). Although the court has not required the ALJ to use the precise words "concentration, persistence and pace," it has stated "we will not assume that the VE is apprised of such limitations unless she has independently reviewed the medical record." *Yurt,* 758 F.3d at 857; *see also Varga v. Colvin,* 794 F.3d 809, 813–14 (7th Cir.2015).

**1. The ALJ's findings on paragraph B criteria at steps 2 and 3**

Ploense argues that the ALJ in this case erred first in failing to include in the RFC, and in the hypothetical question posed to the VE, Ploense's moderate limitation in concentration, persistence or pace (CPP) that the ALJ found at steps 2 and 3 of the sequential evaluation. Ploense argues: "In fact, the ALJ found at step three that Ploense had moderate limitation in concentration, persistence, or pace

(CPP). R. 98. Yet, the ALJ failed to convert such findings into a full and complete hypothetical question as required by law. SSR 96–8p." Pl.'s Br. in Reply 2, ECF No. 18.

The law cited by Ploense, namely SSR 96–8p, does not support his argument that the ALJ erred in failing to include his finding of moderate limitations in CPP at step 3 in his RFC; in truth, it states the exact opposite. SSR 96–8p is entitled "Policy Interpretation Ruling Titles II And XVI: Assessing Residual Functional Capacity In Initial Claims." 1996 WL 374184. The Ruling "clarifies the term 'RFC' and discusses the elements considered in the assessment. It describes concepts for both physical and mental RFC assessments." *Id.* at \*1. As relevant here, the Ruling explicitly addresses the SSA's psychiatric review technique described in 20 C.F.R. §§ 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF). It "requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the 'paragraph B' and 'paragraph C' criteria of the adult mental disorders listings." *Id.* at \*4. The Ruling contains the following caution:

> the adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in

12.00 of the Listing of Impairments, and summarized in the PRTF.

*Id.*

In arriving at his findings on the paragraph B criteria, the ALJ gave little weight to the opinions of Drs. Lefevre and Rattan, the two State consulting psychologists who reviewed the file and concluded that Ploense had no limitation in maintaining CPP and, indeed, that he did not even have a severe mental impairment. R. 458, 468, 479. In addition, the ALJ essentially ignored the emphatic conclusion in Dr. Condit's report that Ploense had *"no* cognitive disorder" and that the head injury he sustained on August 13, 2010, was "probably mild." R. 409. Instead, the ALJ concluded from Ploense's testimony at the hearing and the recent consultative evaluative report by Dr. Krawiec that Ploense had moderate limitations in CPP. The ALJ then used this finding at steps 2 and 3 of the sequential evaluation process to determine whether Ploense's mental impairment was severe (it was) and whether it met a listing (it did not) in accordance with 20 C.F.R. § 404.1520a(d). R. 98–99.

In accordance with SSR 96–8p, the ALJ expressly stated in his decision that "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process." R. 99. Also in accordance with the Ruling, the ALJ stated, "The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings of the Listing of Impairments (SSR 96–8P)." R. 99–100. Thus, not only did the ALJ not violate SSR 96–8p; he explicitly complied with it. For the ALJ to treat his step 3

findings as to the broad paragraph B criteria as an RFC assessment would have been a clear violation of the SSA's specific Ruling on the subject. *See Vigil v. Colvin,* 805 F.3d 1199, 1203 (10th Cir.2015) ("The ALJ's finding of a moderate limitation in concentration, persistence, or pace at step three does not necessarily translate to a work-related functional limitation for the purposes of the RFC assessment.").

*Varga, Yurt,* and the entire line of cases Ploense relies upon in support of his claim of error are distinguishable. In *Varga,* for example, the ALJ found at step 3 of the sequential process that the claimant had moderate limitations in CPP, but then failed to provide the more detailed assessment of the claimant's RFC that SSR 96–8p requires at step 4 and 5. 794 F.3d at 813, 816. A detailed assessment of a claimant's mental RFC is typically provided by a state consulting psychologist on a form called a Mental Residual Functional Capacity Assessment (MRFCA) if the state consultant concludes from the PRTF that the claimant's mental assessment is severe but does not meet or medically equal a listing. This is explained in detail in the SSA's Program Operations Manual System (POMS), "a primary source of information used by Social Security employees to process claims for Social Security benefits," at DI 24505.025 and DI 24510.060–65 at https://secure.ssa.gov/apps 10/poms.nsf/partlist. In *Varga,* although the state consultant had completed Section I, the summary conclusion portion of the MRFCA, he failed to include the narrative statement of the claimant's mental RFC in Section III of the form. 794 F.3d at 816. According to the SSA's POMS, "Section III is for recording the formal narrative mental RFC assessment and provides for the MC to prepare a narrative statement for each of the subsections (A through D) in section I." DI 24510.065. *Varga* held that "where, as here, no narrative translation exists—because of error on the part of the doctor or the agency—an ALJ's hypothetical question to the VE must take into account any moderate difficulties in mental functioning found in Section I of the MRFCA form, including those related to concentration, persistence, or pace." *Id.* In this case, as the following section explains, the ALJ provided the more detailed assessment that SSR 96–8p requires.

*Yurt* is likewise distinguishable from the facts of this case. In that case, the ALJ relied on the MRFCA of a state consulting psychologist who reviewed the file to conclude that the claimant who suffered from a psychotic disorder that caused him to experience auditory hallucinations and uncontrollable rage, had the RFC "to perform a full range of work at all exertional levels so long as he had only brief and superficial interaction with others and was not around large numbers of individuals." 758 F.3d at 852, 856. The court held that the ALJ had erred in adopting the non-examining psychologist's RFC finding because it failed to account for the limitations the psychologist himself highlighted on the MRFCA form. *Id.* at 859. Perhaps even more importantly, the consultant had relied upon the highest GAF scores the claimant had been given instead of the more frequent low scores indicating far greater impairment given him by professionals who had actually dealt with him. *Id.* at 860. These deficiencies, along with the ALJ's failure to mention the claimant's bifrontal tension headaches, which a neurologist described as having a tendency to recur every day, were enough to require remand without the court even addressing the question of whether the ALJ had properly assessed the opinions of the claimant's treating physicians and psychologists. *Id.* In this case, by contrast, the ALJ did not simply adopt a state non-examining consultant's opinions, but instead assessed the claimant's RFC based on all the evidence

before him. It is to that assessment that I now turn.

## 2. The ALJ's RFC Assessment

The SSA assesses a claimant's RFC "based on all the relevant evidence in [the claimant's] case record." 20 C.F.R. § 1545(a)(1). At the State agency level, a State agency medical or psychological consultant is responsible for assessing the claimant's RFC. *Id.* § 404.1546(a). When a case proceeds to an administrative hearing, the ALJ is responsible for assessing the claimant's RFC. *Id.* § 404.1546(c).

At step 4 of the sequential evaluation process in this case, the ALJ determined that Ploense could perform a wide range of work in the medium exertional category with the following non-exertional limitation: "simple, routine, repetitive tasks, but not at a production rate pace (e.g. assembly line)." R. 100. In arriving at this determination, the ALJ considered Ploense's testimony and statements concerning his symptoms, the objective medical evidence and the opinion evidence in the record in accordance with the applicable regulations and rulings. R. 100.

■ The ALJ first considered Ploense's claimed symptoms. The ALJ noted that Ploense testified that he was unable to work due to the effects of the August 10, 2010 injury that he claimed resulted in confusion, cognitive inabilities, memory deficits, and chronic headaches. Ploense further testified that he could only remain focused for fifteen minutes at one time and that he had pain and myalgia, which he attributed to McArdle disease, that prevented him from sitting more than five or ten minutes at a time and lifting more than a gallon of milk. R. 100. Because the intensity, persistence, or functionally limiting effects of the symptoms he claimed was not substantiated by objective medical evidence, the ALJ was required, in accordance with SSR 96–7p, to make a finding

as to the credibility of his statements based on the entire case file.

Upon his consideration of the evidence, the ALJ found that Ploense's testimony and statements concerning the intensity, persistence, and limiting effects of his symptoms "not entirely credible" for a number of reasons. *Id.* The ALJ first noted that Ploense's alleged symptoms were inconsistent with his activities of daily living. In particular, the ALJ noted that Ploense had worked for Binder's Edge (sic) from May 2013 to February 2014, earning $11,535.92, well over the level of substantial gainful activity, in 2013 alone. This work activity, the ALJ observed, "is indicative of a continuing ability to work and detracts from the credibility of the claimant's allegations that his impairments prevent him from sustaining work." R. 101. The ALJ likewise found it significant that Ploense had collected unemployment benefits during the alleged period of disability which required a certification that he was ready, willing and able to work. *Id.* The ALJ also concluded that the extreme report of symptoms and limitations in Ploense's testimony were inconsistent with living on his own, maintaining a house, and performing the activities he described. Finally, the ALJ noted that Ploense initially gave a non-specific response when asked why he was unable to work and that the continuing improvement and conservative treatment noted in the medical reports was inconsistent with the severity of the symptoms he was now claiming. *Id.*

This was particularly true with respect to Ploense's complaints of nearly constant pain and muscle tearing over his life. Despite the severity of the symptoms Ploense described in his testimony, the ALJ noted that "the records contained minimal objective findings." No medical report other than the treatment record from Dr. Mattio

from just two weeks before the his hearing even mentioned McArdle disease and even then it was listed as only a likely diagnosis based on complaints of muscle pain. The ALJ noted that examination resulted in normal findings, including normal musculoskeletal and neurological findings, and the only treatment was diet modifications and pain medication. *Id.* The ALJ contrasted this recent report with the findings of the State agency medical consultants that Ploense had no exertional limitations but must avoid concentrated exposure to hazards.

The ALJ's analysis more than supports his finding that Ploense's testimony and statements were "not entirely credible." Despite his finding that Ploense was not entirely credible, however, and even in the absence of clear medical evidence supporting Ploense's exertional limitations, the ALJ gave the State agency medical consultants only "partial weight" and limited Ploense to medium work "consistent with his recent diagnosis of McArdle disease. R. 101–102.

As to Ploense's mental health impairments, the ALJ noted the records contained little mental health treatment or objective findings. He noted that according to the December 2010 neuropsychological examination report, Ploense tested within normal in attention, intellectual abilities, language, executive functioning, memory and motor functioning. R. 102. There was minimal treatment or medication management. While there were concerns about anxiety and depression, in a mental health evaluation in April 2011, Ploense scored only in the "minimal to mild range" on both depression and anxiety. *Id.*

Turning to the report of Dr. Krawiec, the ALJ noted that while Ploense has "moderate to marked limitations understanding, remembering, carrying out, and making judgments on detailed instructions,

he has only mild limitations understanding, remembering, carrying out, and making judgments on simple instructions." *Id.* The ALJ stated he gave this assessment substantial weight "because it was consistent with the corresponding objective examination findings, including grossly intact memory with only mild deficit on memory testing." *Id.* The ALJ also stated Dr. Krawiec's assessment was consistent with Ploense's longitudinal treatment records, which showed improvement in cognitive dysfunction since the work incident, and with his functional activities of daily living. *Id.*

■ Having given "substantial weight" to Dr. Krawiec's opinion, Ploense argues that the ALJ erred in then failing to incorporate the limitations Dr. Krawiec found in his RFC and the hypothetical question he posed to the VE. Ploense contends that the ALJ's RFC limiting him to simple, routine, repetitive tasks but not at a production rate pace like an assembly line does not capture the extent of his nonexertional limitations as found by Dr. Krawiec.

At the outset, it should be noted that the fact that the ALJ accorded "substantial weight" to Dr. Krawiec's opinion does not mean that he adopted it in full. The ALJ's assessment of a claimant's RFC is to be made upon consideration of "all relevant evidence" in the file, including the credibility of the claimant and the other medical evidence and opinions. In this case, other than Dr. Krawiec, no other psychologist who evaluated Ploense or reviewed the record concluded that he had a cognitive impairment. The ALJ gave "substantial weight" to Dr. Krawiec's opinion simply in concluding that he had any mental impairment at all.

Second, it is important to be clear about precisely what Dr. Krawiec said in his report and the "Medical Source Statement

Of Ability To Do Work–Related Activities (Mental)" he completed. In the Medical Source Statement, Dr. Krawiec made checks indicating that Ploense had mild limitations in understanding and remembering simple instructions, carrying out simple instructions, and the ability to make judgments on simple work-related decisions. R. 491. According to the form, a "mild" limitation "is a slight limitation in this area, but the individual can generally function satisfactorily." *Id.* Dr. Krawiec checked "moderate" to "marked" to describe the limitations Ploense had in understanding and remembering complex instructions, carrying out complex instructions, and the ability to make judgments on complex work-related decisions. *Id.* "Moderate," according to the form, means "there is more than a slight limitation in this area but the individual is still able to function satisfactorily." "Marked" means "there is a serious limitation in this area. There is a substantial loss in the ability to effectively function." *Id.* Dr. Krawiec also indicated that Ploense had a "mild to moderate cognitive difficulty re: short term memory and slowness of cognitive processing." *Id.* In the summary section of the written report that accompanied the Medical Source Statement, Dr. Krawiec wrote:

I believe that in general, this individual has cognitive capacity to understand and carry out simple job instructions. He might get tripped up with anything beyond that due to the cognitive difficulty that he has. The slowness of mental processing that he displayed could interfere with his ability to maintain adequate pace in a work setting.

R. 488.

Limiting Ploense to "simple, routine, repetitive tasks, but not at a production rate pace (e.g. assembly line)" appears to capture the limitations Dr. Krawiec found. Dr. Krawiec expressly found that Ploense could understand, remember, and carry out simple instructions and make judgments on simple work-related decisions, but that he might not be able to handle more complex work. The ALJ therefore included in his RFC the limitation "simple, routine, repetitive tasks." Dr. Krawiec also believed that the slowness of mental processing "could interfere with [Ploense's] ability to maintain adequate pace in a work setting." R. 488. To address this concern, the ALJ added a limitation that the pace of work would not be at the rate of an assembly line. Though Dr. Krawiec stated Ploense's impairment "could interfere with his ability to maintain adequate pace in a work setting," he did not say that it would do so, and even if he did, the ALJ was not required to accept this aspect of his opinion.

To repeat, the ALJ did not adopt Dr. Krawiec's opinion as his own; he merely gave it substantial weight. Under the SSA's regulations, it is the responsibility of the ALJ to assess the claimant's RFC at the hearing level, 20 C.F.R. § 404.1546(c), and there was more than sufficient evidence explicitly cited by the ALJ in his written decision to support his conclusion that Ploense could handle simple, routine, repetitive tasks at less than an assembly line pace. This evidence included both the fact that he had apparently done so from May 2013 until January 2014 when he was working full-time at the Binding Edge, that the neuropsychological examination over four days in December 2010 revealed "normal findings in attention, intellectual abilities, language, executive functioning, memory, and motor functioning," and that he was "not entirely credible" in his testimony and statements concerning the intensity, persistence, and limiting effects of his impairment. R. 100–101. In sum, substantial evidence supports the RFC the ALJ assessed, and I find no error. The decision of the Commissioner must therefore be affirmed.

## III. CONCLUSION

For the reasons given above, the decision of the Commissioner is **AFFIRMED**.

**SO ORDERED** this *8th* day of March, 2016.