In the

# United States Court of Appeals
## For the Seventh Circuit

———————————

No. 18-2105

DEBARA DECAMP,

*Plaintiff-Appellant,*

*v.*

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

*Defendant-Appellee.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 15-CV-1261 — **William C. Griesbach**, *Chief Judge.*

———————————

ARGUED JANUARY 23, 2019 — DECIDED FEBRUARY 26, 2019

———————————

Before WOOD, *Chief Judge*, KANNE, and ST. EVE, *Circuit Judges*.

PER CURIAM. Debara DeCamp, a 55-year old woman, challenges the denial of her applications for Disability Insurance Benefits and Supplemental Security Income, in which she claimed disability based on a benign brain tumor, neck and back issues, and bipolar disorder. DeCamp argues that the administrative law judge erred by failing to (1) evaluate

properly DeCamp's limits with concentration, persistence, or pace, (2) support her decision to limit DeCamp to 10 percent off-task time for purposes of assessing residual functional capacity ("RFC"), and (3) support her adverse credibility determination. We agree that the ALJ did not properly address De-Camp's limitations in concentration, persistence, or pace, and on that basis we remand.

## I. BACKGROUND

DeCamp has a history of depression, drug overdoses, and suicidal thoughts. She overdosed on medication three times in October 2007. She admitted to doctors that she had attempted suicide and had been cutting her legs. Her treatment notes also reflect a history of alcohol abuse.

In 2010 DeCamp complained of headaches, and an MRI revealed a tumor in her pineal gland, which secretes hormones that regulate sleep cycles. A neurosurgeon noted that the mass was benign and directed DeCamp to follow up about her migraines with her primary-care doctor, Dr. Jane Walloch, and repeat the MRI in six months. DeCamp did so, and Dr. Walloch—noting an improvement in DeCamp's headaches—increased her dosage for Cymbalta (an antidepressant). De-Camp also told Dr. Walloch of her plans to travel, and the doctor told DeCamp to follow up upon her return.

DeCamp returned to Dr. Walloch in 2011 and reported feeling depressed. She no longer had health insurance, De-Camp said, so Cymbalta was too expensive. DeCamp told Dr. Walloch that her headaches had returned and that she was "cutting again" in connection with her depression. Dr. Walloch changed DeCamp's medication and referred DeCamp to psychiatric counseling.

In August 2011 Dr. Esther Lefevre, a psychologist, re-
viewed DeCamp's medical records and completed two ques-
tionnaires—a Psychiatric Review Technique ("PRT") Form
and a Mental Residual Functional Capacity Assessment
("MRFC"). On the PRT form, Dr. Lefevre checked a box not-
ing that DeCamp had "moderate" limitations in maintaining
concentration, persistence, or pace. The doctor also desig-
nated on the MRFC form that DeCamp was "moderately lim-
ited" in two more ways—her ability (1) "to perform activities
within a schedule, maintain regular attendance, and be punc-
tual within customary tolerances" and (2) "to complete a nor-
mal workday and workweek without interruptions from psy-
chologically based symptoms and to perform at a consistent
pace without an unreasonable number and length of rest pe-
riods." In a supplemental narrative explanation, Dr. Lefevre
elaborated that DeCamp "may have some difficulty with con-
centration and persistence at times but she is able to meet the
demands of basic unskilled work."

DeCamp told Dr. Walloch in November 2011 that her
headaches were worse. She added that she was not harming
herself and had no suicidal thoughts. Dr. Walloch changed
DeCamp's medication for her migraines and encouraged her
to follow up with her primary care doctor for an MRI of her
head.

Agency psychologist Michael Goldstein, Ph.D., examined
DeCamp in March 2012 and prepared a report that described
mental limitations similar to those found by Dr. Lefevre. Dr.
Goldstein noted that DeCamp had "mild" limitations in un-
derstanding, remembering, and carrying out simple instruc-
tions, and "moderate" limitations in maintaining concentra-
tion, attention, and work pace, and in adapting to change.

And DeCamp had "extreme" limitations in withstanding routine work stresses and responding appropriately to co-workers and supervisors.

Dr. Deborah Pape, another state-agency doctor, opined that DeCamp was more limited than Dr. Lefevre found. On a MRFC form, Dr. Pape specified that DeCamp was "markedly" limited in her abilities "to understand and remember detailed instructions" and "to carry out detailed instructions." She also was "moderately" limited in her ability to sustain concentration and persistence. Dr. Pape made "no severe findings of diff[iculty] getting along [with] others, supervisors or coworkers," but she added that DeCamp was "capable of withstanding the demands of unskilled as defined by SSA" with moderate limitations.

At a hearing in December 2012 before an ALJ, DeCamp described how pain in her back, leg, and hands limited her daily activities. Her pain made it difficult to stand, walk, sleep, or grip things. She added that she cared for a dog and a bird and was able to make simple meals, like soup or microwaved meals. And she said that she was able to walk to her mailbox and back.

At another hearing in 2015,[1] DeCamp testified that she had migraines four times a week that lasted all day. On a typical day, she would watch television, read, use social media, and lie down. Her medications also made her tired, so she preferred to sleep when she felt "super depressed." But her drug and alcohol problems were under control, she added.

---

[1] The Commissioner had agreed to a new hearing after the ALJ issued an unfavorable decision without explaining how Dr. Pape's opinion was used in crafting DeCamp's mental RFC.

The ALJ then questioned the vocational expert about jobs a hypothetical claimant with similar limitations to DeCamp could perform. The ALJ asked the vocational expert whether jobs existed for a hypothetical claimant who, as relevant here, was:

> limited to unskilled work involving [Specific Vocational Preparation ("SVP")]: 2 or less; no fast paced production line or tandem tasks; few if any changes in the work setting, meaning that the work place and tasks change no more than occasionally and only one or two times per month at most; no more than occasional interaction with coworkers, supervisors, and the public; she may be off task or off pace up to 10 percent of the work day in addition to regular breaks.

The vocational expert, who testified that she had reviewed an unspecified "E file"[2] in preparation for the hearing, responded that jobs existed for such a person. But if the hypothetical claimant might "be off pace or off task more than 15 percent of the work day" or "need additional unscheduled breaks," then no competitive work would be available.

The ALJ applied the required five-step analysis for assessing disability, *see* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), and concluded that DeCamp was not disabled. The ALJ determined that DeCamp had not engaged in substantial gainful employment since her alleged onset date in February 2009 (step one); that her conditions ("history of

---

[2] We asked the parties at oral argument to clarify what was in DeCamp's "E file." They agreed that the "E file" is a subset of the administrative record, namely, those files designated with the letter "E" at the end of the exhibit number.

cervical discectomy in 2003; right carpal tunnel release in 2004; L5-S1 lumbar fusion in 2010; chronic back pain; longstanding neoplasm of the pineal gland; headaches; history of substance abuse; and affective and anxiety disorders") were severe impairments (step two); that these conditions did not equal a listed impairment (step three); that she had the residual functional capacity to perform light work, except that she was limited to "unskilled work … with no fast-paced production line or tandem tasks," and she could "occasionally interact with coworkers, supervisors, and the public," and she "may be off task up to 10 percent of the workday, in addition to normal breaks" (step four); and that she could work as a machine tender, sorter, or office helper (step five).

In determining that DeCamp's conditions did not equal a listed impairment at step three, the ALJ applied a so-called "special technique" to evaluate mental impairments. *See* 20 C.F.R. §§ 404.1520a, 416.920a. That method requires an ALJ to consider "pertinent symptoms, signs, and laboratory findings" to determine whether a claimant suffers from a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). Although the ALJ determined that DeCamp did not have a listed impairment, the ALJ concluded that DeCamp had "moderate" restrictions in social functioning and concentration, persistence, or pace, and "mild" limitations in her activities of daily living.

In determining DeCamp's RFC, the ALJ gave some weight to the mental limitations identified by Drs. Lefevre, Pape, and Goldstein. Those doctors' opinions supported "moderate" restrictions in concentration, persistence, or pace, and "mild" restrictions in understanding, remembering, and carrying out simple instructions. The ALJ therefore limited DeCamp to

"unskilled work with an SVP of 2 or less, with no fast-paced production line or tandem tasks, at a job that allows her to be off task up to 10% of the workday." The ALJ also referred to the opinions of Dr. Lefevre and Dr. Pape, who regarded De-Camp's limitations not to be disabling.

The ALJ found that DeCamp's account of her symptoms was "not entirely credible" for four reasons. First, DeCamp had decided to take a vacation after her alleged onset date. The ALJ recognized that "a vacation and a disability are not necessarily mutually exclusive," but DeCamp's willingness to travel suggested that she had overstated her symptoms. Next, DeCamp regularly walked her dog, an activity that conflicted with her reports of disabling leg pain. Third, DeCamp's appearance at her mental-status evaluations and hearings, as documented by the examining doctors, suggested that she was not as disabled as she alleged. Last, DeCamp's medical records did not reflect that she had complained of pain or other disabling symptoms from her conditions.

DeCamp sought judicial review, but a district judge upheld the ALJ's decision. The judge explained that the ALJ's credibility assessment was sound because "the ALJ thoroughly discussed the substantial evidence that supports her decision." Moreover, the ALJ properly oriented the vocational expert through hypothetical questions that adopted the doctors' narrative explanations of DeCamp's mental limitations. And DeCamp's challenge to the ALJ's determination that De-Camp would be off-task up to 10 percent of the work day failed, the judge added, because her "argument assumes a precision that this kind of limitation does not allow." Rather, the ALJ's finding permissibly was "based on her judgment as

to the severity of Plaintiff's impairments, not a mathematical measurement."

## II. ANALYSIS

DeCamp first argues that the ALJ's RFC determination and hypothetical question did not include all her limitations in concentration, persistence, and pace, and so the vocational expert could not evaluate whether jobs existed for a claimant with her limitations. Rather, DeCamp contends, the ALJ included limitations in the hypothetical question that did not accurately describe her abilities. The ALJ must explicitly account for all a claimant's limitations in her hypothetical, including limitations in concentration, persistence, or pace, unless the vocational expert has independently reviewed the medical record. *See Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018); *Lanigan v. Berryhill*, 865 F.3d 558, 563, 565 (7th Cir. 2017).

We agree that the ALJ erred by not including DeCamp's "moderate" limitations in concentration, persistence, and pace in the hypothetical question to the vocational expert. The ALJ's hypothetical to the vocational expert omitted any mention of DeCamp's moderate limitations in the four areas identified by Dr. Pape (whose opinion the ALJ cited to support her finding): maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination or proximity to others without being distracted; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace. The ALJ opted instead to limit DeCamp to "unskilled work" with no "fast-paced production line or tandem tasks."

We have previously rejected similar formulations of a claimant's limitations because there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace. *See Moreno*, 882 F.3d at 730; *O'Connor-Spinner v. Colvin*, 832 F.3d 690, 698 (7th Cir. 2016). The ALJ's analysis is similarly flawed with respect to De-Camp's mild limitations in understanding, remembering, and carrying out simple instructions and her moderate limitations in concentration, persistence, and pace as found by Dr. Goldstein. An ALJ need not use "specific terminology," but we have "repeatedly rejected the notion that a hypothetical … confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt v. Colvin*, 758 F.3d 850, 858–59 (7th Cir. 2014); *see also Winsted v. Berryhill*, No. 18-2228, 2019 WL 494052, at *4 (7th Cir. Feb. 8, 2019); *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015). Moreover, the vocational expert did not review De-Camp's medical records, which could have excused the ALJ from stating all DeCamp's limitations. *See Varga*, 794 F.3d at 814; *Yurt*, 758 F.3d at 857.

The Commissioner contends that the ALJ adequately accounted for DeCamp's limitations in her RFC determination and in the hypothetical question to the vocational expert by relying on part of the narrative explanations (the part of the PRT and MRFC forms where the doctors provide a written explanation of their findings, rather than the check-box sections) offered by Dr. Pape and Dr. Goldstein. True, both doctors offered narrative explanations in addition to the check-boxes on the assessment forms, and an ALJ may rely on those descriptions. *See Varga*, 794 F.3d at 816. But even if an ALJ may

rely on a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms such as the PRT and MRFC forms. *See Yurt*, 758 F.3d at 859. In *Yurt*, a narrative explanation translated the limitations identified by doctors in the check-box sections of the forms. *See id*. at 854–55. We still reversed and remanded because the ALJ did not adequately account for the limitations identified by the doctor in the check-box section of the forms. *See id*. at 859. Here, the ALJ similarly focused her analysis on the doctors' bottom-line conclusion that DeCamp was not precluded from working without giving the vocational expert any basis to evaluate *all* DeCamp's impairments, including those in concentration, persistence, and pace.

### III. CONCLUSION

Because we determine that the ALJ did not properly evaluate DeCamp's limitations in concentration, persistence, and pace, we do not address DeCamp's other arguments. Accordingly, we VACATE the judgment and remand this case to the district court with directions to remand the case to the Social Security Administration.