NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 29, 2020
Decided February 20, 2020

**Before**

WILLIAM J. BAUER, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

No. 19-2030

| | |
|---|---|
| BRYAN K. KUYKENDOLL, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Indiana, |
| | South Bend Division. |
| *v.* | |
| | No. 3:17-CV-766 RLM-MGG |
| ANDREW M. SAUL, | |
| Commissioner of Social Security, | Robert L. Miller, Jr., |
| *Defendant-Appellee.* | *Judge*. |

## O R D E R

Bryan Kuykendoll, a 53-year-old man with a host of physical and mental health conditions, challenges the denial of his applications for disability insurance benefits and supplemental security income. He argues that, when determining his capacity to perform work-related tasks, the administrative law judge insufficiently accounted for his "moderate" limitations in concentration, persistence, or pace, as well as his intolerance for respiratory irritants and use of a cane. He also contends that the ALJ improperly discounted a treating psychiatrist's opinion and inappropriately inferred from his limited daily activities that he could work. Because substantial evidence supports the ALJ's decision, we affirm.

## I. Background

In the seven years before most recently applying for benefits, Bryan Kuykendoll held a variety of jobs, including general laborer, factory worker, and janitor. During this period, he experienced many of the ailments underlying his current disability claim, including depression, anxiety, and pain in his back, shoulders, feet, knees, and hands. He applied for, but was denied, benefits four times.

In 2014, Kuykendoll again applied for disability insurance benefits and social security income, asserting that physical pain and depression precluded him from working as of March 1, 2011. The Social Security Administration denied his claims at all levels of review. Because Kuykendoll primarily challenges the ALJ's assessment of his mental impairments, we focus on this medical history.

Beginning in 2010, Kuykendoll saw several doctors who assessed his mental health, most of them in connection with his applications for benefits. That year a psychologist, acting as an agency consultant, performed a mental status examination. While noting that a comprehensive evaluation was precluded by Kuykendoll's "vague, non-specific, non-elaborative, and distant manner," he made a "parsimonious" diagnosis of an unspecified cognitive disorder. Two years later, a consulting physician examined Kuykendoll; she noted "no evidence of psychiatric abnormality" or present anxiety and determined that he could follow simple directions and do simple calculations. The next year, another consulting psychologist examined Kuykendoll and diagnosed him with a "mild" depressive disorder, noting that although his "attention and concentration appeared fair to good," his mood was irritable and he complained of chronic fatigue, crying spells, and an inability "to get over upsetting events in a timely fashion." The psychologist opined in his medical source statement that Kuykendoll would be able to "learn simple new vocational skills," to "understand, take and follow instructions," and to "perform[] simple repetitive acts" that did not exacerbate pain. But his "stress tolerance" was "well below average," and he "may struggle to get along with coworkers," the doctor noted, but he would generally be capable of following instructions.

Following a referral from this latest psychologist, Kuykendoll saw a licensed clinical social worker, Mark Snell, who noted that Kuykendoll did not report "any typical symptoms of depression" but diagnosed him with dysthymic disorder (a form of long-term depression) and recommended therapy. Snell noted that Kuykendoll reported problems maintaining employment and controlling his temper, and that he

was "discouraged by his life." He also noted that Kuykendoll's affect and mood were normal, he was able to pay attention, and his memory was intact. A year later (November 2014), Snell diagnosed major depression, stating that Kuykendoll's symptoms, particularly his depressed mood, had worsened due to his health problems that prevented him from working.

In mid-2014, Dr. Douglas Streich, a psychologist acting as an agency consultant, examined Kuykendoll and diagnosed a depressive disorder with a "limited symptom profile." While noting that Kuykendoll's depressive symptoms seemed to have increased over the past year, Dr. Streich opined that they did not merit a diagnosis of major depressive disorder. Kuykendoll stated that he was unable to focus on a television show for longer than ten minutes and that he loses focus on a conversation quickly, but otherwise, Dr. Streich noted, he denied "pervasive concentration disruption."

In November 2014, Kuykendoll saw a psychiatrist for the first time. Dr. Michael Platt diagnosed him with major depressive disorder and anxiety, and prescribed antidepressant and antianxiety medications. The next month, the doctor again noted depressed mood and anxious affect and changed Kuykendoll's medications. In February 2015, Kuykendoll reported that his depression was "adequately treated" but requested an increased dosage of his anxiety medication. In April, Dr. Platt noted worsening depression and irritability and persistent anxiety and prescribed a mood stabilizer. By the end of 2015, Dr. Platt had diagnosed Bipolar II Disorder. In 2016, Kuykendoll reported worsening depression and irritability, and Dr. Platt adjusted his medications. The most recent treatment note from August 2016 remarks that Kuykendoll "appears stable and baseline" and that Kuykendoll had reported improved irritability and anger on the new medication.

In a short letter dated February 24, 2015, addressed "to whom it may concern," Dr. Platt reported that Kuykendoll's depression, anxiety, irritability, and insomnia "may limit his ability to work full time," but that he showed "some improvement in symptoms" with treatment. In February 2016, Dr. Platt completed a two-page assessment of Kuykendoll's mental ability to perform work-related activities. Dr. Platt opined that Kuykendoll could "carry out simple directions only," his depression limits his ability to work with others, and he would miss multiple days of work due to his depression. He stated that he would expect Kuykendoll's symptoms to cause him to fail to timely complete tasks for at least one hour in an eight-hour workday. He further

opined that Kuykendoll was not capable of sustaining work on a continuous basis but left blank a question asking for a reason for this opinion.

At a November 2016 hearing before the ALJ, Kuykendoll testified that the "main problem" preventing him from working was limited mobility in his left shoulder after three rotator cuff surgeries. He testified only briefly about mental health issues. When the ALJ inquired about them, Kuykendoll stated that his attention is "very short" and he can get angry quickly, explaining that he was once fired for "cuss[ing] [his boss] out." He testified that he generally spent his days at home with his mother, watching television, making simple meals, and completing some limited activities to help his mother but no "hard type of work."

The ALJ then posed two hypothetical questions to a vocational expert who had read Kuykendoll's file and listened to his testimony. The physical limitations differed between the two questions (the second limited him to sedentary work), but the mental limitations were the same: "understanding, remembering, and carrying out instructions is limited to performing simple and routine tasks, and using judgment in dealing with changes in the work setting are both limited to simple work-related decisions." The vocational expert testified that a claimant with the first set of limitations could work as an usher, information clerk, and amusement and recreation attendant; one with the second set could not perform work available in the national economy. The VE responded affirmatively when asked by Kuykendoll's attorney if adding limitations of "no contact with the public, and limited contact with coworkers, and limited contact with supervisors" would eliminate all jobs for the hypothetical claimant.

Applying the standard five-step process, *see* 20 C.F.R. §§ 404.1520, 416.920, the ALJ concluded that Kuykendoll was not disabled. Kuykendoll's anxiety and depression, degenerative disc disease, and myriad shoulder issues were severe impairments, but none, alone or in combination, met or equaled a listing consistent with a presumptive disability. (As relevant to this appeal, among the impairments the ALJ recognized but deemed non-severe was a "breathing related condition," diagnosed alternatively as asthma or chronic obstructive pulmonary disease.) The ALJ determined that Kuykendoll's mental impairments caused "moderate" limitations in concentration, persistence, or pace, though he was able to handle his own medical care, care for his mother, and follow doctors' instructions. The ALJ also remarked that Kuykendoll's treating providers generally described his attention and concentration as being "within normal limits."

The ALJ next determined that Kuykendoll had the residual functional capacity (RFC) to perform light work, but he was limited to "simple routine work tasks with simple work-related decisions." The ALJ noted that Kuykendoll's deficits in concentration, persistence, or pace caused "moderate difficulty" in understanding, remembering, and carrying out detailed instructions, and thus, he was limited to "simple, routine, and repetitive work tasks."

In assessing Kuykendoll's abilities, the ALJ concluded that Kuykendoll's statements about his limitations were "not entirely consistent" with the record. He first sought mental health care in late 2013, even though he alleged serious depression and anxiety for nearly ten years prior. Moreover, his treatment records often reflected normal orientation, attention, and concentration, and his symptoms improved with medication. The ALJ also gave "little weight" to Dr. Platt's mental assessment of Kuykendoll's work abilities and to letters by him and Snell, describing their opinions as "conclusory" or as unsupported by the record. But he did ascribe "some weight" to Dr. Platt's opinion that Kuykendoll could carry out only simple directions and needed a work environment with simple work-related decisions because that assessment was consistent with the record. The ALJ determined that, in light of his RFC, Kuykendoll was unable to perform any of his past jobs, but, consistent with the VE's opinion, could perform other work; therefore, he was not disabled.

After the Appeals Council denied review, the district court affirmed the ALJ's decision. Kuykendoll appeals.

## II. Analysis

We review the district court's decision de novo and ask whether the ALJ's decision was based on substantial evidence. *Stephens v. Berryhill*, 888 F.3d 323, 327 (7th Cir. 2018). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Kuykendoll contends that the ALJ failed to include all of Kuykendoll's supported mental health limitations in the hypothetical questions posed to the vocational expert and in the corresponding RFC in his written decision. In doing so, he offers two arguments.

Kuykendoll first asserts that the ALJ erred by denying controlling weight to the opinions of Dr. Platt, his treating psychiatrist, who opined that Kuykendoll's symptoms limit his ability to work on a continuing basis. With respect to applications filed before March 27, 2017, ALJs must give "controlling weight" to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." *Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019) (quoting *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010)); *see also* 20 C.F.R. § 404.1527(c)(2).

The ALJ reasonably gave little weight to Dr. Platt's February 2015 letter stating that Kuykendoll's symptoms "may limit" his ability to work full time because, in the same letter, Dr. Platt noted that Kuykendoll showed improvement in his symptoms with treatment. Kuykendoll argues that the comment that he showed some improvement does not negate the earlier work limitation. Perhaps, but even certain of Dr. Platt's treatment records post-dating this letter (including from his most recent appointment) reflect Kuykendoll's improved symptoms with treatment. Further, it is unclear what the ALJ should have done with the bare statement that the symptoms "may limit" Kuykendoll's work ability. This is not an opinion that Kuykendoll *could not* work, and the general, unexplained assertion does not suggest any specific functional limitation that the ALJ could have accounted for in the RFC. And Kuykendoll offers no guidance.

The ALJ also reasonably ascribed only little weight to most of Dr. Platt's February 2016 opinion because the limitations he suggested were unexplained and inconsistent with the record. For example, where the form asked for a brief explanation of why Kuykendoll would be incapable of sustaining work on a continuing basis, Dr. Platt said nothing. And although he remarked that Kuykendoll would chronically fail to complete tasks in a timely manner for an hour or more per workday, Dr. Platt's treatment notes consistently reflect Kuykendoll's attention and concentration were within normal limits. Further, while Dr. Platt stated that Kuykendoll would miss multiple days of work "due to depression," he made no mention of the effectiveness of his treatment, including medication. Although Dr. Platt's treatment records document Kuykendoll's struggles with depressed mood, anxiety, and irritability as a result of his conditions, the records do not contain support for the specific functional limitations that Dr. Platt assigned. Therefore, the ALJ was entitled to expect some explanation to accompany them. *See Schaaf v. Astrue*, 602 F.3d 869, 874–75 (7th Cir. 2010) (affirming denial of benefits where ALJ discounted treating physician's report because the doctor

did not explain his opinion, his treatment notes did not clarify his reasoning, and the report was inconsistent with substantial evidence in the record).

Next, relying on *Yurt v. Colvin*, 758 F.3d 850 (7th Cir. 2014), and *Crump v. Saul*, 932 F.3d 567 (7th Cir. 2019), Kuykendoll also contends that limiting him to "simple routine work tasks" does not adequately account for the "moderate" deficiency in concentration, persistence, or pace that the ALJ ascribed to him. Often, "employing terms like 'simple, repetitive tasks' on their own will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence, and pace." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). But we will let stand "an ALJ's hypothetical omitting the terms 'concentration, persistence, and pace' when it [is] manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Id.* at 619.

Here, the ALJ adequately accounted for the moderate limitation by excluding from the hypotheticals posed to the VE—and the corresponding RFC—tasks that Kuykendoll would be unable to perform due to specific deficits. First, the ALJ noted that Kuykendoll has "moderate difficulty in understanding, remembering, and carrying out detailed instructions." To account for this, the ALJ explained that Kuykendoll must "therefore" be limited to "simple, routine, and repetitive work tasks." And because of his stress, anger, or irritability, he also was limited to "simple work-related decisions in dealing with changes in the work setting." That the ALJ found these specific deficits in concentration, persistence, or pace and then connected them to the assigned limitations distinguishes this case against those Kuykendoll relies upon. *See Yurt*, 758 F.3d at 857–59 (describing ALJ's omission of six areas of moderate limitations in concentration, persistence, or pace); *see also Crump*, 932 F.3d at 570 (describing ALJ's failure to account for plaintiff's inability to stay on-task).

Notably, Kuykendoll posits no relevant limitations in concentration, persistence, or pace that the ALJ should have included in his RFC assessment. *See Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (ruling any error in RFC harmless in part because plaintiff hypothesized no additional restrictions). He initially rests on the incorrect premise that the ALJ "placed **no** CPP limitations in the RFC." Kuykendoll then argues that limitations reflected in Dr. Platt's opinions should have been included in the RFC assessment. But as discussed, the ALJ did not err in ascribing little weight to most of these opinions. Kuykendoll then references his testimony that his attention is short and he gets upset quickly. But the ALJ specifically addressed this deficit to the extent he

credited it. Otherwise, the ALJ found that Kuykendoll's statements about his symptoms were only partially consistent with the medical evidence, including Dr. Platt's treatment notes reflecting that Kuykendoll's attention and concentration were within normal limits and that medication helped to control his anger.

Next, Kuykendoll argues that the ALJ failed to account for certain physical impairments—his pulmonary conditions and use of a cane—in the hypotheticals to the vocational expert and the RFC analysis. With respect to his breathing conditions, which the ALJ recognized as present but controlled with treatment, Kuykendoll contends that the ALJ should have limited his exposure to respiratory irritants or triggers. But we agree with the Commissioner that there is no possible harm from this omission; Kuykendoll does not establish, or even argue, that the jobs referenced by the VE— usher, information clerk, and amusement and recreation attendant—involve exposure to irritants or triggers. And although Kuykendoll was at one time prescribed a cane for tendonitis (which does not appear to be an ongoing impairment), the ALJ specifically noted that he testified that he uses a cane only "occasionally" and that the treatment records did not show that he required a cane during his physical examinations.

Finally, Kuykendoll asserts that, in declining to include more functional limitations in the RFC, the ALJ inappropriately over-emphasized his daily activities by equating them with the ability to do competitive work on a full-time basis. We have cautioned against such an analysis. *See Beardsley v. Colvin*, 758 F.3d 834, 838–39 (7th Cir. 2014); *see also Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). But all the ALJ said about Kuykendoll's activities—specifically, independent grooming, taking care of his mother, driving to the grocery store, and managing money— when weighing his subjective complaints was that they "are not limited to the extent one would reasonably expect given the functional deficits alleged." This is hardly equating the activities with the ability to work full time. And, in any case, we agree with the Commissioner that any possible error was harmless (the Administration argues that the daily activities were "hardly dispositive"). The ALJ mentioned his daily activities as only one of many factors in assessing Kuykendoll's RFC. The ALJ also considered ample objective medical evidence, including exam records and treatment history, as well as opinion evidence. His daily activities were not the "main reason" for discounting Kuykendoll's self-reported capabilities. *See Beardsley*, 758 F.3d at 838.

AFFIRMED